Vast Voobhis, J.
These appeals and cross appeals relate to the sufficiency of the evidence before the Grand Jury to sustain indictments for grand larceny against Yonkers Contracting Co., Inc. (hereafter called Yonkers) and a number of its officers and employees, also indictments likewise for grand larceny against certain members and employees of an engineering firm known as Briggs, Blitman and Posner. Bribery indictments were also found against Yonkers and two of its officers, as well as one Louis G. Blackball, who was then an engineer in the employ of the State Department of Public Works. The Appellate Division held that the Grand Jury minutes disclosed sufficient evidence to sustain the charges against all of these defendants, but that each of the individual defendants had acquired immunity except the defendant Cipolla on a grand larceny charge, and the defendants Snook and Posner of the engineering firm who, also, were charged with grand larceny. Being a corporation, Yonkers cannot claim immunity (Matter of Bleakley v. Schlesinger, 294 N. Y. 312) and is subject to the charges of grand larceny and of giving or offering bribes. As the case comes to us, Cipolla, Snook and Posner are charged with grand larceny, first degree, and Yonkers is subject to that charge and, alone among the defendants, to the other charge of giving or offering bribes. Each of them appeals. The People appeal from the dismissal of the indictments against individual defendants. In addition to asserting immunity, each defendant contended (and contends before us) that the evidence before the Grand Jury was insufficient to establish larceny by anyone even when unexplained and uncontradicted (Code Crim. Pro., § 251).
On December 30, 1954, as a result of competitive bidding on a unit price basis, Yonkers was awarded a contract by the State of New York for the construction of 5.21 miles of the New England Section of the New York State Thruway in the County of Westchester, extending between Mamaroneck and Central Avenues. The bid price computed from the State’s estimate of unit price quantities was $5,056,140. Instead of supervising the work through engineers employed in its Department of Public Works, the State contracted with the said engineering firm of Briggs, Blitman and Posner to supervise and inspect the work done by Yonkers and to certify to the unit quantities including the amount of excavation which was to be paid for at the rate of *330 $2 per cubic yard. Yonkers was paid $5,972,408.13 for the entire job on certificates by the engineering firm.
The basis for the indictments concerns the item described as 2BX denominated “ Unclassified Excavation ’ for which Yonkers was paid $2,006,651.80. The alleged overpayments related entirely to the quantities of “ unsuitable material ” which Yonkers claimed to have excavated under this category. The State contends that Yonkers was overpaid at the rate of $2 per cubic yard for 63,318 cubic yards of unsuitable material in excess of what was removed. In dollars that would amount to $126,636 which is the figure stated in the indictment.
The trouble appears to have arisen due to the disintegration of the engineering firm. Briggs and Blitman had for many years been competent professional engineers. Defendant Posner, now 80 years of age, retired in 1952 after 36 years on the engineering staff of the New York Central Railroad, where he became engineer of structures and in charge of the bridge department for the railroad. In 1953 he joined the Briggs firm as an associate consulting engineer and took over the bridge design department (approximately 50 bridges were involved in the supervising work which his firm did on the New England Section of the New York State Thruway). In 1957 Robert Briggs, founder and chief executive of the firm, died. Blitman had another business, several of their key employees left for other more promising opportunities, and the responsibility fell upon Posner of concluding the supervision of some $22,000,000 of contracts after which the firm expected to and did dissolve. Whatever may have been the cause, it is undisputed that at or about this time the supervisory work of the Briggs firm was considerably neglected.
One of the important responsibilities of the engineering firm in supervising the performance by Yonkers of this road construction contract consisted in keeping track of the quantity of unsuitable material excavated by Yonkers under 2BX of the contract at $2 per yard. Before building the road the grades were blueprinted for east and westbound lanes and mall in the middle. In some places the grade of the road coincides with the ground level. Elsewhere the ground level needs to be lowered or raised. When that has been accomplished the road surface is covered with a foot in thickness of gravel which is *331 compressed by rollers to nine inches. Above that is laid the reinforced concrete surface for the highway. The usable material which is excavated to reduce the road level is employed as fill where necessary to raise the road level. If, as was true in this portion of the New England Section of the Thruway, more fill is required to raise (“ embank ” is the technical phrase) the level than is obtainable from excavation to lower the ground level, the additional fill which is required is obtained from outside the limits of the highway. Such fill is technically described as “borrow”. Under the terms of the contract, Yonkers was required to exhaust the usable fill from within the highway limits before resorting to 1 ‘ borrow ’ ’ obtained elsewhere. The contractor was paid at the rate of $2 per cubic yard for removing usable fill from places where the highway grade was below the ground level and putting it where the highway grade was above the ground level. Likewise the contractor was to be paid $2 per yard for “ borrow ” to be obtained at the contractor’s expense from places outside of the highway limits and added to the fill obtained from within the highway limits in order to embank the base of the highway where the plans called for locating it above the ground level. In addition to those items, the contractor was required to remove unsuitable material, which is the subject matter of these indictments. Unsuitable material, so-called, lies beneath the highway level. In technical parlance, it is below what is called the “ prism ” of the highway. It consists of muck or other substances unsuitable to form a base for the roadway. In other words, for example, if the ground level coincided with the highway level, where no excavation would otherwise be necessary, muck or other unsuitable material has to be removed and replaced with suitable fill, inasmuch as it would not do to superimpose the gravel and concrete on swampland. Even where the road level is below ground level, unsuitable material would still have to be removed and replaced if it existed below what would otherwise be the bottom of the excavation. There might be places, also, even where the road is “embanked” (road level above ground level) where it is necessary to remove unsuitable material before putting in the fill for the embankment. As has been previously stated, the contractor receives $2 per cubic yard for removing unsuitable material which has to be trucked away from the job and disposed *332 of however the contractor wishes without accountability. It is regarded as useless material, and the only concern of the State regarding it is to get rid of it.
Since the contractor is to be paid at $2 per cubic yard for the excavation and removal of unusable material, which has to be replaced promptly with good earth or other suitable fill, “survey parties ” of supervising engineers need to be constantly on the job in order to measure and record the cubic yardage of unsuitable material removed before the holes are filled so as not to leave the State at the mercy of the quantitative measurements submitted by the contractor. In this instance, the engineering firm of Briggs, Blitman and Posner neglected the inspection. Only partially do the Briggs field notes record subsurface excavation performed by Yonkers, and frequently these were shown to have been conflicting and inaccurate.
Confronted with this situation in the Fall of 1959 — two years and a half after the death of Briggs —Posner, diverted from his specialty of designing and supervising the construction of bridges, found himself confronted by the necessity of certifying the quantities of unsuitable material and other material excavated by Yonkers in the performance of this contract with nothing like adequate contemporary field notes on which to base his conclusions. What the Briggs firm did, in most instances, it is virtually undisputed, was to borrow the figures from Yonkers, and then to certify to the State for payment the same cubic yardage as having been excavated which Yonkers claimed. On October 6, 1959 defendant Posner certified to the State that there was due to Yonkers upon the completed job, up to and including September 30, 1957, the final payment for work performed at the unit prices specified in the contract aggregating $5,972,408.13. The certificate also stated: “ and I further certify that the said amount has been estimated from actual measurements and inspections by me made as Engineer in charge, of all work done and materials in place during my official connection with the said contract, and from the official notes of measurements made by my predecessors of work done under them, and believe to be correct and in strict accordance with the terms of the contract.”
The statement was false that the amount of unsuitable material excavated had been estimated from the engineers’ actual *333 measurements and inspections. Quite possibly Posner might bo subjected to disciplinary proceedings for doing this as a licensed engineer, and he or his firm might have been subjected to some-other forfeiture, penalty or damage claim for falsely certifying that the performance of this part of Yonkers’ contract had been inspected, supervised and contemporary records kept. We do not pass on anything but the criminal charges which are before us. What was done or left undone by the engineers afforded Yonkers the opportunity to inflate the amount of cubic yardage of subsurface excavation of unusable material to the detriment - of the-State. However, the criminal charges against Posner and ■ Snook, of the engineering firm, are not falsely certifying that the work had been inspected but grand larceny. These charges of grand larceny in the first degree depend upon proof that Yonkers intentionally exaggerated the quantity of cubic yardage excavated, and thereby deliberately and fraudulently ■ obtained from the State more than $500 which it knew did not belong to it, and that the engineers were accomplices (principals as defined by Penal Law, § 2) in deliberately enabling Yonkers to do this and likewise were guilty of knowingly and intentionally obtaining unearned additional engineering fees themselves at the rate of 4%% computed upon the amounts payable to the contractor under the contract. As previously indicated, the indictments charge the contractor with stealing $126,636 in this manner and the engineers with misappropriating in addition 4-1/3% thereon amounting to $5,698.62.
Quite plainly before grand larceny can be established prima facie, as was stated by the County Judge, “ the evidence before the Grand Jury must reveal, basically, proof of three matters, namely, (1) that Yonkers (with Briggs) claimed and received payment for more excavation work than was actually done; (2) that such claims were knowingly false and fraudulent within the meaning of the larceny statutes, i. e., were done with an intent to steal; and (3) that each of the named defendants with larcenous knowledge and intent participated in the false and fraudulent claim.” (Italics from original.)
Evidence of opportunity to steal is not equivalent to showing prima facie that an accused did steal, nor does the fact that the engineers furnished the contractor with an opportunity to steal constitute evidence that the engineers stole, either by enabling *334 the contractor to steal or by unwittingly receiving additional engineering fees computed on an amount stolen by the contractor. In certifying to the correctness of the contractor’s, figures and receiving the additional engineering fees, the engineers, in order to be guilty of larceny, had to have notice that the contractor had inflated the quantities of excavated material. Insofar as the engineers are concerned, neglect of duty is not equivalent to theft nor is laxity equivalent to larceny.
As the result of a careful analysis of the testimony and exhibits before the Grand Jury, particularly the computations made from the post-construction test borings and the so-called “ balance of quantities ” method, we are satisfied that there was prima facie evidence before the Grand Jury, which may or may not be found to establish the point by the trial jury, that the quantity of unsuitable material for which the contractor was paid was knowingly overstated by the contractor in an amount sufficient to sustain the grand larceny charges against the contractor. Indictments must be founded on legal evidence (Code Grim. Pro., § 249), and much of the evidence before the Grand Jury was introduced for the purpose of proving that individual defendants connected with the contractor had knowledge of these overages. It is clear enough that, if the quantity of unsuitable material for which Yonkers was paid was so largely inflated, there is evidence that this was knowingly done on the part of some of its officers or agents. It is unnecessary to determine which ones, at this stage of the criminal action, inasmuch as it is being held that the indictment must be dismissed against all of the individual defendants connected with Yonkers on account of immunity. The only one of Yonkers’ officers or employees against whom any grand larceny count has been left standing is appellant Arthur S. Cipolla, who signed a waiver of immunity only after he had given material evidence before the Grand Jury in regard to the larceny charges. He, like defendant Thomas W. Cohill, waived prospectively only, and, as the Appellate Division said concerning Cohill, ‘ ‘ Since we cannot say that the Grand Jury did not return the indictment against him on his testimony given under compulsion on his first appearance, we perforce must dismiss the indictment.” These men were all targets of the investigation, and all acquired immunity under this indictment, although, in such instance, *335 “ reindictment is possible if sufficient evidence, independent of the evidence [before the Grand Jury], links or leads furnished by the prospective defendant, is adduced to support it ” (People v. Laino, 10 N Y 2d 161, 173; People v. Steuding, 6 N Y 2d 214; People v. De Feo, 308 N. Y. 595; People v. Gillette, 126 App. Div. 665). Under the cases cited immunity was acquired even though they or some of them were warned of their rights by the prosecutor before the Grand Jury, and even though they did not claim immunity while being interrogated. Section 2447 of the Penal Law is inapplicable to this situation. The contention of the People was overruled in People v. Steuding (6 N Y 2d 214, 217) that the question of immunity may not be raised upon a motion to dismiss an indictment. It was there held that “ A violation of the constitutional privilege carries with it a dismissal of the indictment returned by the Grand Jury before which the defendant testified.”
Criminal knowledge on the part of appellants Posner and Snook that the contractor’s claim was inflated is, however, a different matter. These two defendants were officers or employees of the engineering firm. Snook was “ engineer in charge ”, responsible for the supervision of the construction contracts to which he was assigned, although not including this one. He left the employment of Briggs, Blitman and Posner in October of 1958, one year prior to the date of the asserted larceny. He has been held on the basis that he directed Yonkers to deliver its excavation notes to the engineering firm while he was still connected with it. It was not a criminal act for the engineers to ask to see these notes, nor does it appear that he knew that the quantities thereby shown of unexcavated material would be copied in the certificate signed by Posner 12 months later, to say nothing of knowing that the figures were false. The opinion by the County Court mentions that some of the diagrams in the hands of the engineers (called “ cross-sections”) plotted from field notes indicated that the bottom horizontal lines marking the depths of the claimed excavations had, in some instances, been changed to show deeper excavations. The County Court correctly concluded, however, that the testimony in the Grand Jury record leaves unsolved who changed these lines, and that there is no testimony that whoever did so intended to defraud the State or harbored any such criminal purpose or criminal *336 consciousness. The engineers’ field notes were shown to have been woefully inaccurate, which constituted breach of contract and of duty toward the State, but not grand larceny in the absence of such criminal knowledge and intent.
Posner, although working under serious difficulties, should have informed the State that his firm had failed to perform that part of its contract which required an independent verification of the quantity of excavated unusable material charged for by the contractor. He ought not to have certified that the amount had been estimated from actual measurements and inspections made by him as engineer in charge and from official notes of measurements made by his predecessors of work done under them. The question before us is not whether he was derelict in the performance of his duty in this regard, but whether there was prima facie evidence against him before the Grand Jury that he is guilty of the felony of first degree grand larceny. The point which the People make against Yonkers is that it was enabled to take advantage of the circumstance that the engineers were not sending out survey parties and had lost track of how much unsuitable material had been excavated. Eventually the engineers adopted Yonkers ’ figures to save face. They did not know how much Yonkers had removed and tried to conceal their ignorance and avert a contention by the State that they had broken their engineering contract by failing to supervise. This is the State’s theory of the facts. Nothing in the record suggests that Yonkers was advertising inflation by it of the cubic yardage removed, Yonkers’ motive and interest (if it did so) was to conceal this from the engineers rather than to reveal it, and the State’s theory is that the contractor was taking advantage of the engineers’ embarrassment to further its own interest. The evidence before the Grand Jury indicates prima facie that this engineering firm was falling apart, broke its contract with the State and certified that it had independently inspected what it had not supervised, but that is not equivalent to participating with the contractor in the knowledge that the latter was mulcting the State. It is not charged nor is there any evidence that the engineers received money or: other consideration from the contractor in any nefarious joint enterprise of that kind. The engineering firm was paid a total of *337 $240,467.19 in fees for the entire job. These indictments charge that $5,698.62 of this $240,467.19 was paid by reason of the engineers’ 4%% commission on the moneys wrongfully paid to the contractor. Although this $5,698.62 was based on what the indictments charge to have been inflated yardage of unsuitable material excavated by the contractor, there is no evidence that the engineers knew it was inflated, or that it was received or to be received otherwise than in the honest belief that the quantity certified had been excavated. It may well be that neither this $5,698.62 nor a much greater part if not the whole of the $240,467.19 in engineering fees would have been payable or paid if the State had known that the engineers were not living up to their contract requiring sending out field parties and supervising the unit quantities of unsuitable material for which the contractor charged the State. In approving the final estimate of cubic yardages the engineers certified that they had performed this part of their contract when they had not done so; but whatever civil or other criminal consequences may have been entailed, the engineers were not guilty of grand larceny unless they knew that the quantity of unsuitable material had been inflated. Many a contracting party has represented, in various ways, that its contract has been performed when such was not wholly the fact, and has been compelled to pay heavily in damages without incurring criminal liability for grand larceny. Receipt of money may be larcenous where no services have been rendered or for goods sold that have never been delivered, where the whole transaction is fictitious. According to this record, however, a great deal of engineering services were rendered satisfactorily by this at one time competent firm, and no question is raised on the papers before us that this section of the New York State Thruway was not properly constructed under adequate supervision except as to this excavated material. The evidence that in some supposedly excavated areas there were trees and remnants of an old macadam road and a dump, which should have revealed to the engineers that no excavation had been done, is scant and equivocal and was correctly analyzed and written off by the County Court. In the absence of evidence that Posner or Snook knew that the quantities of unsuitable material were exaggerated for which the contractor charged, and on the basis of which the *338 engineers received this small proportionate increased cost plus fee, we have concluded that the indictments against them should be dismissed.
There is an additional cogent reason on account of which Posner and Snook have not been shown prima facie to have been guilty of larceny by receiving extra fees based on exaggerated quantities of unsuitable material. The State withheld payment from the Briggs firm of more than the $5,698.62 mentioned in the indictment as having been stolen by the firm. The statement of payments to the engineers, introduced by the People, shows the last payment to have been made February 2, 1959 (Exhibit 34) which was eight months prior to the date when Mr. Posner made the certificate which is the basis for the charge of larceny.
We do.not reach the question whether it was error not to have permitted Posner to testify further before the Grand Jury in explanation of testimony and exhibits introduced by the People.
The other points raised upon these appeals were correctly decided by the Appellate Division.
The order appealed from should be modified by reversing those portions thereof which sustain any of the indictments against defendants-appellants Spencer A. Snook, Harry Posner or Arthur S. Cipolla, and otherwise it should be affirmed. That leaves standing the indictments for grand larceny and bribery against Yonkers Contracting Co., Inc.